Slip Op. 22-21

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE GOVERNMENT OF QUÉBEC,<br><br>        **Plaintiff,**<br><br>   **and**<br><br>MARMEN INC., MARMEN ÉNERGIE<br>INC., MARMEN ENERGY CO.,<br><br>        **Consolidated Plaintiffs,**<br><br>   **and**<br><br>THE GOVERNMENT OF CANADA,<br><br>        **Plaintiff-Intervenor,**<br><br>   **v.**<br><br>THE UNITED STATES,<br><br>        **Defendant,**<br><br>   **and**<br><br>WIND TOWER TRADE COALITION,<br><br>        **Defendant-Intervenor,**<br><br>   **and**<br><br>THE GOVERNMENT OF ONTARIO,<br><br>        **Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Consol. Court No. 20-00168**<br><br>***PUBLIC VERSION*** |

## OPINION

[Plaintiff's, Consolidated-Plaintiffs', Plaintiff-Intervenor's and Defendant-Intervenor's Motions for Judgment on the Agency Record are Denied, and Commerce's Final Results are Sustained.]

Dated: <u>March 18, 2022</u>

**PUBLIC VERSION**

Nancy A. Noonan, ArentFox Schiff LLP, of Washington, D.C., argued for Plaintiff Government of Québec. With her on the joint brief were Matthew J. Clark, Jessica J. DiPietro, and Aman Kakar. With them on the prior briefs were Arent Fox LLP, of Washington, D.C.

Jay C. Campbell, White & Case, LLP, of Washington, D.C., argued for Consolidated Plaintiffs Marmen, Inc.; Marmen Énergie Inc.; and Marmen Energy Co. With him on the brief were Allison J.G.Kepkay, Ting-Ting Kao, and Ron Kendler.

Alan G. Kashdan, McDermott Will & Emery LLP, of Washington, D.C., argued for Plaintiff-Intervenor Government of Canada. With him on the brief were Joanne E. Osendarp, Tim Hruby, and Conor Gilligan.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With him on the brief were Brian M. Boyton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance.

Maureen E. Thorson, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Wind Tower Trade Coalition. With him on the brief were Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Laura El-Sabaawi, and Cynthia C. Galvez.

H. Deen Kaplan, Hogan Lovells US LLP, of Washington, D.C., for Defendant-Intervenor Government of Ontario.

Katzmann, Judge:  Wind towers are used to convert the energy from wind to electrical energy.  Utility scale wind towers, now before the court, are tubular steel structures upon which other wind turbine components are mounted, and are used primarily in utility scale electrical power generation projections.  Petitions for the Imposition of Antidumping and Countervailing Duties, Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam at 7–18 (July 9, 2019), P.R. 1, 2, 7, 9, 15, C.R. 1, 2, 7, 9, 15 ("Petitions").  This case presents five issues arising from the United States Department of Commerce's ("Commerce") final determination after countervailing duty ("CVD") investigation that in derogation of U.S. fair trade laws, subsidies are being provided to producers and exporters of utility wind towers from Canada,  and from Commerce's consequent issuance of CVD orders based on assessment of remedial CVD subsidy rates.  Utility Scale Wind Towers from Canada: Final

**PUBLIC VERSION**

Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances,

85 Fed. Reg. 40,245 (July 6, 2020), P.R. 401 ("Final Results"). The Final Results are now

challenged for a variety of reasons by Plaintiff Government of Québec ("GoQ"), Plaintiff-

Intervenor Government of Canada ("GoC"), and Consolidated Plaintiffs Marmen Énergie and

Marmen Inc. (collectively, "Marmen"), as well as by Defendant-Intervenor Wind Tower Trade

Coalition ("WTTC"). First, Marmen challenges Commerce's determination that Marmen's

proposed foreign currency adjustment from its auditor was unverified and unreliable, and

accordingly properly excluded from the total sales denominator used to calculate the subsidy rate.

Second, WTTC challenges Commerce's determination that the Québec Local Content

Requirement program constitutes a "recurring benefit" such that it was not countervailable during

the period of investigation ("POI"). Third, GoQ and GoC challenge Commerce's determination

that the Québec On-the-Job Training Tax Credit is de facto specific as required by 19 U.S.C. §

1677(5A). Fourth, GoQ and Marmen challenge Commerce's exclusion of tax liabilities in

computing the benefit conferred by the GASPÉTC tax credit. Fifth, GoQ, GoC and Marmen

challenge Commerce's determination of financial contribution and benefit for additional

depreciation allowed for buildings used in manufacturing in Canada's and Québec's tax systems.

The court sustains all of Commerce's challenged determinations and denies the motions of

Plaintiff, Consolidated Plaintiff, Plaintiff-Intervenors, and Defendant-Intervenor for judgment on

the agency record.

# BACKGROUND

## I.   *Legal Background*

The Tariff Act of 1930 (the "Tariff Act") was enacted to empower Commerce to address trade distortions caused by unfair economic practices.[1]   In particular, it provides for the investigation of potential government subsidization and for the imposition of duties on subject merchandise.   Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); see also Bebitz Flanges Works Pvt. Ltd. v. United States, 44 CIT __, __, 433 F. Supp. 3d 1309, 1314 (2020).   These CVD actions are intended to be remedial rather than punitive in nature, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and it is therefore Commerce's duty to determine rates "as accurately as possible," Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

In order to impose duties under Section 701 of the Tariff Act of 1930, Commerce must first find the existence of a countervailable subsidy.   A countervailable subsidy is one which satisfies the following elements: (1) a government or public authority has directly or indirectly provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.   See 19 U.S.C. §§ 1677(5), (5A).   If Commerce determines that

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition.   Citations to 19 U.S.C. §§ 1677e, 1677m however, are not to the U.S. Code, 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition. The current U.S.C.A. reflects the amendments made to 19 U.S.C. §§ 1677e, 1677m (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).   The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.   See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

***PUBLIC VERSION***

a foreign government is providing a countervailable subsidy with respect to the manufacture,

production, or export of a class or kind of merchandise imported, sold, or likely to be sold for

import into the United States, and the International Trade Commission determines that an industry

in the United States thereby is materially injured or threatened with material injury, Commerce is

required by statute to impose a CVD upon such merchandise equal to the net countervailable

subsidy.  See id. § 1677(5).

    With respect to the first factor, the Tariff Act defines financial contribution not only as "the

direct transfer of funds" but also as "foregoing or not collecting revenue that is otherwise due, such

as granting tax credits or deductions from taxable income."  Id. § 1677(5)(D)(i)–(ii).

    With respect to the second factor, the Tariff Act and Commerce regulations set out how

Commerce must define, quantify and allocate benefits.  In relevant part: (i) The Tariff Act provides

that "a benefit shall normally be treated as conferred . . . in the case where goods or services are

provided . . . if such goods are purchased for more than adequate remuneration[,]" id. § 1677(5)(E);

(ii) 19 C.F.R. § 351.503 provides the general rules for identifying and delimiting a benefit; and,

(iii) 19 C.F.R. § 351.509 provides specific rules for benefits provided by means of direct taxes.

    With respect to the third factor, the statute requires that a countervailable subsidy must

exhibit either de jure or de facto specificity.  See 19 U.S.C. § 1677(5A).  A subsidy is de jure

specific where the authority providing the subsidy, or its authorizing legislation, expressly limits

access to the subsidy to an enterprise or industry.  See id. § 1677(5A)(D)(i).  To avoid a designation

of de jure specificity, the administering authority must ensure that access to the subsidy is governed

by objective industry- or enterprise-neutral criteria resulting in automatic eligibility, and that the

criteria for eligibility are both strictly followed and clearly set forth in the relevant official

materials so as to be verifiable.  See id. § 1677(5A)(D)(ii).  A subsidy that escapes de jure

*PUBLIC VERSION*

specificity may nevertheless be designated de facto specific if one or more of the following criteria are satisfied: (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) an enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.  Id. § 1677(5A)(D)(iii)(I)–(IV).

## II.     *Factual and Procedural History*

On July 9, 2019, WTTC filed AD and CVD petitions with Commerce, alleging in relevant part that utility scale wind towers from Canada were subsidized, and that imports of these products were causing material injury to the U.S. wind tower industry.  See generally, Petitions.  On August 6, 2019, Commerce began its investigation of Marmen for the period of investigation ("POI") from January 1, 2018, through December 31, 2018.  See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 84 Fed. Reg. 38,216 (Dep't Commerce Aug. 6, 2019); see also Mem. from J. Maeder to J. Kessler, re: Issues and Decision Mem. for the Final Determ. of the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 3 (Dep't Commerce June 29, 2020), P.R. 399 ("IDM").  Commerce then selected "the two largest producers/exporters of the subject merchandise, by volume," as mandatory respondents: Marmen Énergie and Marmen Inc. (collectively, "Marmen").[2]  Mem. from J. Maeder to J. Kessler, re: Decision Mem. for the Prelim. Determ. of

---

[2] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large

*PUBLIC VERSION*

the Countervailing Duty Investigation of Utility Scale Wind Towers from Canada at 2 (Dep't

Commerce Dec. 6, 2019), P.R. 308 ("PDM").  On December 13, 2019, Commerce preliminarily

determined that countervailable subsidies are being provided to producers and exporters of wind

towers from Canada through eight identified programs or credits; among them, a Québécois tax

credit for on-the-job training, Québec's Tax Credit to Promote Employment in Gaspésie and

Certain Maritime Regions of Québec (GASPÉTC), and Canada's and Québec's treatment of

depreciation for the taxation of certain buildings used in manufacturing.  Utility Scale Wind

Towers From Canada: Prelim. Affirmative Countervailing Duty Determ., and Alignment of Final

Determ. With Final Antidumping Duty Determ., 84 Fed. Reg. 68,126. (Dep't Commerce Dec. 13,

2019), P.R. 313 ("Preliminary Results"); see also PDM at 8–16.  Commerce further preliminarily

determined that the Québec Local Content Requirement, a component of the wind farm energy

production and purchase process, was not countervailable.  PDM at 19–20.

---

number of exporters or producers involved in the investigation or review, the
administering authority may—

   (A) determine individual countervailable subsidy rates for a reasonable number
      of exporters or producers by limiting its examination to—

      (i) a sample of exporters or producers that the administering authority
         determines is statistically valid based on the information available to the
         administering authority at the time of selection, or

      (ii) exporters and producers accounting for the largest volume of the subject
         merchandise from the exporting country that the administering authority
         determines can be reasonably examined; or

   (B) determine a single country-wide subsidy rate to be applied to all exporters
      and producers.

The individual countervailable subsidy rates determined under subparagraph (A)
shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

Subsequently, Commerce conducted a verification of the information submitted by Marmen[3] and published its <u>Final Results</u>.[4]  <u>Final Results</u>; IDM at 9.  In Commerce's <u>Final Results</u>, it concluded that wind towers from Canada were being subsidized at a rate of 1.18% for the mandatory respondent and all others.  85 Fed. Reg at 40,246.  Relevant here, Commerce again found that Québec's on-the-job training tax credit, the GASPÉTC program, and Canada's and Québec's tax treatment of manufacturing facilities provide countervailable benefits, and determined that the Québec Local Content Requirement was not countervailable.

On September 4, 2020, GoQ filed a complaint challenging Commerce's final determination in the investigation of wind towers from Canada.  Compl., ECF No. 2.  On October 5, 2020, GoC joined the case as a Plaintiff-Intervenor,[5] Order, ECF No. 20, and WTTC joined the case as a Defendant-Intervenor, Order, ECF No. 19.  Marmen and WTTC additionally initiated separate appeals of Commerce's determination, which were consolidated into the present case on November 21, 2020.  Order, ECF No. 26.[6]  On February 11, 2021, GoQ, GoC, Marmen and WTTC each moved for judgment on the agency record.  Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 28 ("GoQ's Br."); Consol. Pl.-Int. GoC's  Mem. in Supp. of Rule 56.2 Mot. for J. on

---

[3] Commerce declined to formally verify the responses from GoQ and GoC as a result of travel restrictions imposed in response to the Covid-19 pandemic.

[4] The final countervailing duty order was signed by Commerce on August 20, 2020, and published in the Federal Register on August 26, 2020.  <u>Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Am. Final Affirmative Countervailing Duty Determ. and Countervailing Duty Orders</u>, 85 Fed. Reg. 52,543, 52,545 (Dep't Commerce Aug. 26, 2020), P.R. 425 (reducing the subsidy rate to 1.13% in response to a ministerial error allegation for reasons unrelated to this action).

[5] GoC qualifies as an interested party pursuant to 19 U.S.C. § 1677(9)(B), and is therefore entitled to intervene as a matter of right pursuant to 28 U.S.C. § 2631(j)(1)(B).

[6] The Government of Ontario also joined the action as Defendant-Intervenor, but has not further participated in the litigation.

the Agency R., ECF No. 32 ("GoC's Br."); Mem. of Points & Auths. in Supp. of Pls.' Rule 56.2

Mot. for J. on the Agency R., ECF No. 34-1 ("Marmen's Br.); WTTC's Revised Mem. in Supp.

of its Rule 56.2 Mot. for J. upon the Agency R., ECF No. 36 ("WTTC's Br.") (revised Feb. 12,

2021).  On June 10, 2021, the Government responded to each of these motions.  Def.'s Resp. to

Pls.' Rule 56.2 Mots. for J. on the Agency R., ECF No. 44 ("Def.'s Br.").  Also on June 10, 2021,

(i) GoQ and Marmen responded to WTTC's motion (regarding the Québec Local Content

Requirement), GoQ's Resp. in Opp'n to WTTC's Rule 56.2 Mot. for J. on the Agency R., ECF

No. 42 ("GoQ's Resp."); Consol. Pl.'s Resp. Br., ECF No. 47 ("Marmen's Resp."), and (ii) WTTC

responded to GoC's, GoQ's and Marmen's motions for judgment on the agency record, WTTC's

Resp. Br., ECF No. 45 ("WTTC's Resp.").  Next, on July 8, 2021, (i) GoQ, GoC and Marmen

replied to the responses filed by the Government and WTTC, Reply Br. of Pl. GoQ, ECF No. 56

("GoQ's Reply"); Consol. Pl.-Int. GoC's Rule 56.2 Reply Br., ECF No. 55 (GoC's Reply"); Reply

Br. in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 58 ("Marmen's Reply");

and (ii) WTTC replied to the Government, GoQ and Marmen, WTTC's Reply Br., ECF No. 53

("WTTC's Reply").

On November 12, 2021, the parties submitted responses to questions presented by the court

in advance of oral argument.  Pl. GoQ Resp. to Questions for Oral Arg, ECF No. 74 ("GoQ's Oral

Arg. Subm."); GoC's Resp. to Ct.'s Questions for Oral Arg., ECF No. 76 ("GoC's Oral Arg.

Subm."); Marmen's Resp. to  Ct.'s Questions for Oral Arg., ECF No. 75; Def.'s Resp. to Ct.'s

Nov. 1, 2021 Questions for Oral Arg., ECF No. 77; WTTC Resp. to Ct.'s Questions for Oral Arg,

ECF No. 73.  Oral argument was held on November 17, 2021.  Oral Arg., ECF No. 80.  Finally,

on November 23, 2021, the parties, except WTTC, provided post-oral argument submissions.  Pl.

GoQ's Post Arg. Subm., ECF No. 83; GoC's Post-Arg. Subm., ECF No. 81; Marmen's Post-Arg.

Subm., ECF No. 85; Def.'s Post-Arg. Subm., ECF No. 82.

## III.     Programs Assessed

### Québec Local Content Requirement

The Québec Local Content Requirement is a program in which the electric utility of

Québec, Hydro-Québec, issues calls for tender ("CFTs") for blocks of wind-produced electricity.[7]

To be eligible for the program, wind farm developers attempting to sell electricity to Hydro-

Québec are required to make certain minimum expenditures in Québec in connection with their

wind farms -- some tenders further specified minimum expenditures for specific regions of

Québec.  PDM at 19.  Purchases from Marmen (including from wind turbine manufacturers that

sourced their towers from Marmen), as a Québécois wind tower manufacturer (and, later, with a

facility in the specific subregions), were eligible for inclusion in the required minimum.  Marmen's

Resp. at 4–9.

Commerce determined that, insofar as the GoQ "entrusted and directed" the purchase of

wind towers from Marmen via the Québec Local Content Requirement, it involved a purchase for

more-than-adequate remuneration ("MTAR").    PDM at 20; IDM at 37–38; 19 U.S.C.

§ 1677(5)(B)(iii).  Commerce further concluded, based on the past treatment of purchases of goods

and services for MTAR, that the Local Content Requirement was a recurring benefit.  IDM at 36.

A recurring benefit is allocated to the year the benefit is received.[8]  19 C.F.R. § 351.524(a).

---

[7] A CFT is the process by which a public company solicits bids from companies competing for
works, supply or service contracts.

[8] Generally, Commerce allocates a non-recurring benefit over the number of years corresponding
to the average useful life of a physical asset.  See 19 C.F.R. § 351.524 (explaining the criteria for
identifying and allocating recurring and non-recurring benefits).

Because Marmen did not make sales of wind towers to turbine manufacturers for local content requirement tenders during the POI, Commerce found no benefit during the POI and declined to countervail the program.  IDM at 38; <u>see also</u> Marmen's Resp. at 4.

> Québec's On-the-Job Tax Credit Program.

Québec's On-the-Job tax credit "encourages businesses to take on trainees and improve the professional skills of young workers" by allowing those businesses which do so to "claim a tax credit at a rate of 24% in respect to the salary or wages paid to the student or apprentice, and the salary or wages paid to an employee for hours devoted to the supervision of the student or apprentice."  GoQ's Initial Questionnaire Resp., Ex.QC-C09-A at 1 (Oct. 9, 2019), P.R. 132; <u>see also</u> PDM at 15.  Ultimately, Commerce determined that the On-the-Job tax credit provided a de facto specific subsidy because the "actual number of recipients that benefited from the tax credit during the POI relative to the total number of tax filers during the POI are limited in number on an enterprise basis."  IDM at 56.  It accordingly found a 0.01% ad valorem subsidy.  <u>Id.</u> at 7.

> GASPÉTC

GoQ's GASPÉTC tax program provides a 15% tax credit for qualifying salary and wages paid by an eligible company to eligible employees.  PDM at 15–16.  However, the amount of GASPÉTC credit claimed by an eligible company in a given tax year is treated as taxable income in the subsequent year.  <u>Id.</u>  On Marmen's tax-year 2017 return (filed in 2018), it claimed GASPÉTC credit toward provincial income taxes payable in Québec and included the amount of GASPÉTC credit it claimed in tax-year 2016 as income.  IDM at 52; <u>see also</u> Marmen's Br. at 11.

Commerce found the benefit conferred to be the value of the tax credit claimed in tax-year 2017 and declined to reduce the value of the benefit by the additional 2017 tax liabilities Marmen

incurred by including its tax-year 2016 GASPÉTC credit as income in tax-year 2017.  Ultimately,

Commerce found a 0.78% ad valorem subsidy.  Id. at 7.

Additional Depreciation

Both Federal and Provincial (Québecois) tax systems provide a depreciation deduction,

called the Capital Cost Allowance ("CCA"), for property used to earn business or property income.

Both systems divide assets into classes, which are then assigned their own rates and methods of

depreciation over the useful life of the asset.

Under the Canadian CCA, Class 1 includes three kinds of buildings: residential buildings,

non-residential buildings primarily used for manufacturing or processing and other non-residential

buildings (e.g., buildings used in retail).  GoC's Br. at 1.  In Québec, Class 1 is designated for non-

residential buildings.  GoQ's Br. at 28.  In both systems, the generally applicable rate of CCA for

Class 1 assets is 4%, but taxpayers can claim a higher rate of depreciation for certain types of non-

residential property.  An additional 6% depreciation is allowed when at least 90% of an eligible

building's floor space is used for manufacturing or processing and the building was acquired after

March 18, 2007.  IDM at 22.  Similarly, an additional 2% depreciation is provided for eligible

buildings acquired after March 18, 2007 when at least 90% is used for non-residential use.  Id.

Taxpayers in both systems must place the asset into a separate class to receive the additional

depreciation.  GoC's Br. at 12; GoQ's Br. at 28.  This additional deprecation purportedly reflects

differences in the useful life of assets used in manufacturing or other non-residential capacities,

according to an empirical study conducted by an agency of GoC, Statistics Canada.

Marmen claimed the 10% depreciation on certain buildings.  Marmen's Br. at 9–10.

Commerce treated the additional depreciation as a financial contribution and quantified the benefit

as the 6% difference from the otherwise applicable rate for Class 1 assets.  IDM at 24.  Commerce

ultimately determined a subsidy rate of 0.07% ad valorem.  Id. at 6.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581 and 19 U.S.C.

§ 1516a(a)(2).  As noted above, a subsidy is countervailable if it satisfies the elements of 19 U.S.C.

§ 1677(5): (i) a government or public authority has provided a financial contribution; (ii) a benefit

is thereby conferred upon the recipient of the financial contribution; and (iii) the subsidy is specific

to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  See 19

U.S.C. §§ 1677(5), (5A).

The court sustains Commerce's CVD determinations, findings, and conclusions unless they

are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence "has been defined as 'more than a mere

scintilla,' [and] as 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335

(Fed. Cir. 2002) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The

substantiality of evidence must account for anything in the record that "fairly detracts from its

weight."  CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting

Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)).  This includes

"contradictory evidence or evidence from which conflicting inferences could be drawn."

Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994)

(quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)).  Commerce must also

examine the record and provide a satisfactory explanation for its findings such that the record

demonstrates a rational connection between the facts accepted and the determination made.  See

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983);

Jindal Poly Films Ltd. of India v. United States, 43 CIT __, __, 365 F. Supp. 3d 1379, 1383 (2019).

Commerce's findings may be found to be supported by substantial evidence even where two

inconsistent conclusions could be drawn from the record.  Aluminum Extrusions Fair Trade

Comm. v. United States, 36 CIT 1370, 1373 (2012) (citing Consolo v. Fed. Mar. Comm'n, 383

U.S. 607, 620 (1996)).  However, agencies act contrary to law if their decision-making is not

reasoned.  Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167−68 (1962).

## DISCUSSION

The court concludes that Commerce's final determination was in accordance with law and

supported by substantial evidence.  First, Commerce permissibly excluded the foreign auditor's

adjustment as unreliable.  Second, Commerce reasonably and lawfully determined that the Québec

Local Content Requirement provided a recurring benefit.  Third, Commerce acted reasonably

within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec

On-the-Job Training tax credit was a de facto specific subsidy.  Fourth, Commerce acted in

accordance with law in excluding increased tax liabilities when conducting the benefit calculation

for GASPÉTC.  Fifth and finally, Commerce acted reasonably and in accordance with law when

finding that the additional depreciation rate for Class 1 assets constituted a financial contribution

and benefit equal to the difference between the rate assessed and the rate applicable if the additional

depreciation were not claimed.

*I.*     ***Commerce's Exclusion of Marmen's Foreign Currency Auditor Adjustment Was
         Supported by Substantial Evidence and in Accordance with Law.***

To calculate the total sales denominator for assessing the subsidy rate, Commerce used the

total free-on-board sales less intercompany sales.  IDM at 40–44.  In both the Preliminary Results

and <u>Final Results</u>, Commerce relied on sales figures provided by Marmen in response to

Commerce's Initial Questionnaire instead of on a later submission that included an adjustment

from Marmen's auditor.  IDM at 41.  This later submission was provided in response to

Commerce's request, prior to making its preliminary determination, for reconciliation of

Marmen's reported sales figures.  <u>Id.</u>  Marmen's response included  both revised sales figures and

an exhibit that provided for "necessary adjustments," including one for "Year End auditor

adjustment in GL[] for Gain(loss) exchange rate."  <u>Id.</u>  at 41.  This adjustment was not further

explained by the submission, except where Marmen noted that its "foreign currency transactions

are translated into Canadian dollars using the exchange rate in effect at the date of transaction."

Letter from Marmen to W. Ross, re: Utility Scale Wind Towers from Canada: Ministerial Error

Comments at 2 (Dec. 18, 2019) P.R. 318 ("Marmen's Ministerial Error Comments").  Commerce

used the initial sales figures in its <u>Preliminary Results</u> without making any adjustments, and

subsequently declined to amend the <u>Preliminary Results</u> in response to Marmen's filed comment

arguing that failure to make the adjustments constituted ministerial error.  IDM at 41–44; <u>see

generally</u> Marmen's Ministerial Error Comments.

At verification, Commerce learned that during the POI Marmen recorded the value of sales

denominated in United States dollars ("USD") in its general ledger sales accounts in the amount

of the USD-value of the sale, which were then treated on a one-to-one basis with Canadian dollars

("CAD").  IDM at 42; Mem. from Y. Bordas to File, re: Verification of Questionnaire Resps. of

Marmen, Inc. Marmen Énergie Inc., and Gestion Marmen at 24 (Dep't Commerce Apr. 16, 2020),

P.R. 374, C.R. 309 ("Marmen Verification Report").  Thus, Marmen's listed USD sales were

undercounted in the total sales figures provided to Commerce, which Marmen reported in CAD.

Marmen explained that to reach its final sales figures, it made year-end currency conversions

through an auditor's adjustment.  IDM at 42.  Accordingly, it argued that its total sales denominator

should reflect the foreign currency exchange adjustments.  Id.

When Commerce examined the sales accounts that were identified as needing to be

converted from USD into CAD, it discovered five sales that were actually coded in the general

ledgers as having been transacted in Euros.  IDM at 42.  Moreover, upon further investigation,

Commerce discovered that two of the sales coded in the general ledgers as Euro-denominated

were, in fact, transacted in CAD.  Id.  The other three were, indeed, transacted in Euros.  Marmen

Verification Report at 26–28.  As the USD to CAD currency conversion would be inappropriate

for at least these five sales, Commerce found the auditor's adjustment to be unverified and

unreliable.  IDM at 43.  Instead, relying on facts available pursuant to 19 U.S.C. § 1677e,

Commerce calculated the total sales denominator using Marmen's reported information, as it had

in the Preliminary Results.  IDM at 43.  In so doing, Commerce explained that it conducts spot

checks because it is unable to review every sale, but was satisfied with the accuracy of the data

without the auditor's adjustment: "we find that the vast majority of the sales-related and other tests

Commerce performed throughout the verification uncovered no other errors."  Id.

Marmen now makes two primary arguments:[9] (i) Commerce acted contrary to law by

failing to identify compelling evidence that the independent auditor was not in good standing prior

to rejecting its report, Marmen's Br. at 14–17, and (ii) Commerce unreasonably inferred from the

record that the auditor's adjustment was unreliable, id. at 17–21.  The court rejects each, and

---

[9] Marmen also argues that "[c]ertain mistaken findings clouded Commerce's judgment[.]"
Marmen's Br. at 22–24.  The court declines the invitation to theorize about Commerce's unstated
reasoning.  Just as it may not consider post-hoc rationalizations, "the court must judge the propriety
of [agency] action solely by the grounds invoked by the agency."  Burlington Truck Lines, 371
U.S. at 169.

Case 1:20-cv-00172-GSK   Document 37   Filed 03/23/22   Page 17 of 36

Consol. Court No. 20-00168                                                    Page 17
*PUBLIC VERSION*

concludes that Commerce acted in accordance with law and with the support of substantial evidence when it applied facts available after identifying evidence of errors in the proposed foreign currency adjustment.

Marmen's argument that Commerce must accept an independent auditor's analysis of a respondent's financial statements, in the absence of "compelling evidence" that the auditor is not in good standing, is unavailing. Id. at 15–16. In support of the compelling evidence requirement, Marmen cites one case from this court, SeAH Steel VINA Corp. v. United States, 41 CIT __, __, 269 F. Supp. 3d 1335, 1352 (2017), and two administrative determinations, Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2005–2006, 73 Fed. Reg. 1,202 (Dep't Commerce Jan. 7, 2008) ("2008 Pipe Fittings A.R.") and Notice of Final Results and Final Rescission in Part of Antidumping Duty Admin. Rev.: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan; 2004–2005, 71 Fed. Reg. 67,098 (Dep't Commerce Nov. 20, 2006) ("2006 Pipe Fittings A.R."). Id. Even if the court were bound by the logic of SeAH Steel, that decision does not impose a rule requiring compelling evidence to set aside information provided by an auditor. See WTTC's Resp. at 15–16 (arguing this interpretation). Rather, SeAH Steel provides only that Commerce "can . . . accept the independent auditor's report as reliable unless 'compelling evidence' exists that the auditor is not in 'good standing.'" 269 F. Supp. 3d at 1352 (quoting 2006 Pipe Fittings A.R.) (emphasis added). Nor does Commerce's ability to accept the findings of independent auditors supersede its duty to verify the information it relies upon in making its final determination. 19 U.S.C. § 1677m(i). Moreover, the administrative determinations cited by Marmen each involve Commerce's review of an auditor's judgment as to the reasonableness of various exclusions from otherwise accurate financial statements -- not, as in this case, Commerce's determination to reject an auditor's

erroneous currency adjustments.  See Issues and Decision Mem. at Cmt. 1 accompanying 2008

Pipe Fittings A.R.  Nor was there any evidence, in the 2006 or 2008 Pipe Fittings A.R., that

contradicted the independent auditor's conclusions.  Id.; see also 2006 Pipe Fittings A.R.  This is

in sharp contrast to the present case, where the auditor's adjustments were shown to be at least

partially in error.  Accordingly, Marmen has not established that Commerce acted contrary to law

or past practice when it rejected the auditor's adjustment without compelling evidence that the

auditor was not in good standing.

    Second, Marmen has not established that Commerce was unreasonable to conclude based

on the record that the auditor's adjustment was unreliable.  Marmen, in effect, argues that

Commerce could not infer that there might be further errors from the five erroneously Euro-coded

sales comprising less than 0.2% of the total value of Deloitte's exchange rate adjustment.[10]

Marmen's Br. at 17.  Specifically, Marmen argues (i) the only errors identified were the five Euro-

coded errors; (ii) Commerce checked all the other Euro-coded sales and found no errors; and (iii)

Commerce's other spot-checking revealed no additional errors.  Marmen's Reply at 4, 13.

However, as the Government notes, "errors uncovered in a spot check undermine the reliability of

data more broadly."  Def.'s Br. at 33–34.[11]  While the impact of the discovered errors, taken alone,

---

[10] Marmen also argues that Commerce did not conduct a "spot check" at all because it reviewed a
Marmen-prepared list of USD sales.  Marmen's Reply at 4–7.  Instead, Marmen contends,
Commerce only conducted spot checks later when it selected invoices at random and found no
discrepancies.  This argument is not persuasive for two reasons.  First, it would lead to undue
interference in how Commerce conducts verification (including altering investigated party's
impetus for compliance) if the court assessed and attributed significance to who identified what
during verification.  Second, as discussed, the very existence of errors has significance.  See also
infra note 11.

[11] The fact that the Euro-coded errors were identified is a sufficient basis for Commerce's
determination that other USD-coded sales proposed to be converted might also be in error.  Even
if the Euro-coded errors have been comprehensively accounted for, the causes of those errors have
not.  Commerce was not unreasonable to conclude that the proposed adjustments may include

*PUBLIC VERSION*

on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors. Thus, Commerce's determination that the auditor adjustment is unreliable is not unreasonable. Accordingly, Commerce's determination was supported by substantial evidence and not contrary to law. It is sustained.

## II. *Commerce's Finding that the Québec Local Content Requirement Provided a Recurring Benefit Is Reasonable and in Accordance with Law.*

Commerce determined that the Québec Local Content Requirement was a recurring benefit such that, under 19 C.F.R. § 351.524(a), it is appropriately allocated to the year it was received. IDM at 36–37. Because Marmen did not make sales of wind towers in connection with CFT during the POI, Commerce therefore concluded that the Québec Local Content Requirement program did not confer any benefit on Marmen during the POI. Id. at 36. Accordingly, Commerce did not impose a countervailing duty. Id. at 38.

Commerce found that the Québec Local Content Requirement program provided a recurring benefit because it was a benefit in the form of the purchase of goods and services for MTAR ("MTAR benefit"). While Commerce has reserved formal regulation of MTAR benefits for a later date, it has stated that its intended approach is similar to the treatment of benefits in the form of less-than-adequate remuneration ("LTAR"). 63 Fed. Reg. 65,348, 65,379 (the "Preamble"); see 19 C.F.R. § 351.512. Here, Commerce explained that its determination relied on past treatment of MTAR benefits and LTAR regulations that indicate that the provision of goods

---

transactions denominated in the general ledger in a currency different than that in which they were actually transacted or other errors not identified by the auditor. The fact that the additional spot checks did not uncover errors does not negate the inference of unreliability given the auditor's failure to identify and resolve the Euro-coded errors.

and services for LTAR ("LTAR benefits") are normally treated as recurring benefits.[12]

If a subsidy is not on the illustrative lists or if a party challenges the treatment of a specific subsidy according to its position on one of the lists, the regulations also provides a three-part "test for determining whether a benefit is recurring or non-recurring." 19 C.F.R. § 351.524(c)(2). In this case, after the publication of the <u>Preliminary Results</u>, WTTC challenged Commerce's recurring benefit determination and its failure to apply the three-part test. <u>See</u> IDM at 33; Petitioner Case Brief at 20 (May 6, 2020), P.R. 381, C.R. 312. Subsequently, in its IDM, Commerce considered each component of the three-part test and concluded that "Marmen's <u>sales of wind towers</u>" (emphasis added) under the Québec Local Content Requirement program did not meet these criteria such that they would be considered a non-recurring benefit. IDM at 37.

The three-part test for the existence of a recurring benefit requires Commerce to consider:

(i)     Whether the subsidy is exceptional in the sense that the recipient cannot expect to receive additional subsidies under the same program on an ongoing basis from year to year;

(ii)    Whether the subsidy required or received the government's express authorization or approval (i.e., receipt of benefits is not automatic), or

(iii)   Whether the subsidy was provided for, or tied to, the capital structure or capital assets of the firm.

---

[12] Following the same principles as in LTAR analyses, Commerce has previously treated MTAR benefits as recurring benefits allocated to the year of receipt. PDM at 20. Commerce's analysis of LTAR benefits is guided by the regulation on "[a]llocation of benefit to a particular time period." 19 C.F.R. § 351.524. That regulation provides "non-binding illustrative lists of recurring and non-recurring benefits" and includes the provision of goods and services for LTAR as an example of a recurring benefit. 19 C.F.R. § 351.524(c). In addition, that regulation provides that LTAR benefits are allocated to the year received: either the year in which the recipient pays for the low-cost goods, or when the recipient was due to have paid the government for goods or services. 19 C.F.R. § 351.511(b)–(c). Citing both the past treatment of MTAR benefits and the LTAR analysis, Commerce found that the Québec Local Content Requirement program provided a recurring benefit, which was not conferred during the period of investigation. IDM at 36.

19 CFR 351.524(c)(2).  With respect to the first part, Commerce explained that "[a]lthough issued as four discrete tranches, the CFTs were for purchases of wind energy, i.e., electricity, not wind towers.  Marmen did not sell wind energy.  Instead, it sold wind towers on a regular basis."  IDM at 37.  With respect to the second part, Commerce found that the sales of wind towers did not require approval from the GoQ.  Id. at 38.  Commerce explained that while Marmen produced some certification documents that were provided to Hydro-Québec, they were product specification documents, not sales approval documents for GoQ to expressly authorize or approve. Id. at 37.  Finally, Commerce explained that, regarding the third part, the sales under the Québec Local Content Requirement program did not benefit "Marmen's capital structure or assets any more than any sale normally benefits a company."  Id.[13]

WTTC now argues that Commerce acted unreasonably and unlawfully when it applied the three-part test to determine the program provided a recurring benefit because it failed to take into account material record evidence and deviated from its regulations without explanation.  WTTC's Br. at 11–12.  First, WTTC contends that Marmen could not expect to receive subsidies on a regular basis because Marmen made wind tower sales "contingent on Marmen's ability to meet the [local content requirements] provided in each specific CFT," and therefore, "the limitation of

---

[13] In addition, Commerce specifically considered an earlier supply agreement between Marmen and General Electric [[

                                   ]].  IDM at 37–38.  Commerce explained that the relationship of the [[                    ]] to the benefits in the form of wind tower sales for MTAR was indirect and retroactive and thus not tied to capital assets.  Id.  For contrast, under past practice, Commerce found a benefit to be non-recurring when a "government financial contribution [] directly and/or indirectly prospectively support or contributes to a company's capital assets."  Id. at 37.  Moreover, Commerce explained that, even if those advanced funds were under investigation as a potential subsidy -- Commerce noted that WTTC did not make the proper allegation as to the elements of a subsidy -- they were provided prior to the POR and would have fallen outside the scope of its analysis.  Id. at 38.

these CFTs to four discrete tranches necessarily limited the benefit that Marmen received from the sales" stemming from the four CFTs.  Id. at 14.  Second, WTTC maintains that Commerce failed to adequately address evidence that the subsidies under the program were not automatic but required the government's express authorization or approval -- including evidence that Marmen's contracts with customer-wind turbine manufacturers explicitly referred to the local content requirement and included documentation for GoQ's "compliance processes [that] demonstrated . . . GOQ expressly approved and monitored each and every project."[14]  Id. at 16–18.  Finally, WTTC asserts that Commerce mistakenly determined that the Québec Local Content Requirement program did not benefit Marmen's capital structure because it failed to consider, as required by regulation, how the program affected the "continued existence" of Marmen, WTTC's Br. at 19, 21–22,[15] and further failed to consider how the Québec Local Content Requirement program promoted the continued existence of the firm when it "spurred the creation of demand for wind energy generation and required the fulfilment of this demand from wind tower manufacturing

---

[14] In addition, WTTC argues that Commerce did not make a specific determination as to which documents it identified as "product specifications" in the IDM.  WTTC's Reply at 13–15.  But, Commerce need not have cited to the evidence binder so long as "the path of its decision" is otherwise reasonably discernible.  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

[15] WTTC argues that Commerce failed to address evidence that the [[
                                    ]] were linked to subsequent purchases of wind towers when Commerce found that those funds did not directly benefit Marmen's capital structure.  WTTC's Br. at 25.  In relevant part, WTTC contends that the Québec Local Content Requirement program prompted General Electric to enter into an agreement with Marmen that [[

                       ]], and that this agreement was linked to wind tower sales because [[

                                    ]].  Id. at 23–24.  However, as Commerce correctly notes, the funds contributed were outside the scope of Commerce's analysis as they were provided prior to the average useful life in question.  IDM at 38.

facilities in Québec," WTTC's Br. at 21–22.  The court considers each of WTTC's arguments in

turn, and concludes that each fails to establish that Commerce acted unreasonably or unlawfully.

Regarding WTTC's first contention, Commerce reasonably concluded that the benefits

under the local content requirement were conferred on a regular basis through the regular, frequent

purchase of wind towers based on the record of substantial sales under the program each year until

2017.[16]  IDM at 37 ("Marmen's regular, frequent sales of wind towers to its customers . . . were

not exceptional events.  Although issued as four discrete tranches, the CFTs were for purchases of

wind energy, i.e., electricity, not wind towers.  Marmen did not sell wind energy.  Instead, it sold

wind towers on a regular basis.").  While the analysis of the subsidy is complicated by how GoQ

effectuates the serial transactions which relay the benefit from Hydro-Québec to Marmen, the IDM

shows that Commerce extensively considered the nature of the transactions before concluding that

the subsidies were regular and non-exceptional.  Id.  WTTC has not established that Commerce's

consideration was unreasonable or otherwise inconsistent with the record, and the court therefore

rejects WTTC's first argument.

With respect to WTTC's second contention, WTTC argues that Commerce's determination

that GoQ was not required to provide express approval or authorization was unsupported by

substantial evidence as a determination based on the singular and unsupported assertion that the

Marmen's certification documents provided product specifications, not certifications for approval.

---

[16] WTTC argues that "'it is not use of a benefit that determines whether it is a recurring or non-recurring subsidy,' but the conditions under which the relevant authority offers the subsidy." WTTC's Reply at 9 (citing Issues and Decision Mem. accompanying Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determ. and Final Negative Determ. of Critical Circumstances, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008)).  Nonetheless, Commerce's determination is consistent with this contention.

WTTC's Br. at 14, 19.  The extent of Commerce's stated reasoning with regard to this second point is indeed sparse: "Further, we do not find that the certification Marmen provided to [Hydro-Québec] with its Québec LCR sales constitute express authorization or approval by the GOQ. Marmen's certifications are product specification, not sales approval, documents."  IDM at 37. While brief, Commerce's conclusion is nevertheless sufficiently reasoned.  As no one contends that particular sales from Marmen to turbine manufacturers were themselves subject to GoQ approval, the natural expectation is that the component of these serial transactions that GoQ might have expressly approved were the certification documents.  Accordingly, it follows logically that -- as Commerce determined -- GoQ did not expressly authorize or approve the subsidy as it relates to Marmen.  Accordingly, the court concludes that, with respect to the second prong of the recurring benefit test, Commerce adequately considered the record evidence and its rationale was reasonably discernible.  See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Lastly, with respect to the third part of the test, WTTC's argument that Commerce must consider how the program benefitted the "continued existence of the firm" is not persuasive.  The Government correctly identifies that the text WTTC cites in the Preamble, 63 Fed. Reg. at 65,393, explains why Commerce considers whether a benefit is tied to capital structure or assets, not how. Def.'s Br. at 16.  More generally, WTTC has not persuaded the court that Commerce unreasonably concluded that sales under the program did not "benefit[] Marmen's capital structure or assets any more than any sale normally benefits a company."  IDM at 37.  Rather, although the CFTs may have driven demand for Marmen's wind towers, there is no evidence in the record suggesting that the resultant sales were materially distinguishable from Marmen's everyday tower sales. Commerce's determination that the Québec Local Content Requirement conferred a recurring

benefit outside the POI and is thus not countervailable is sustained.

### III.   *Commerce's Finding that the Québec On-the-Job Training Tax Credit Is De Facto Specific Is Reasonable and in Accordance with Law.*

The Tariff Act provides that Commerce can find de facto specificity if one or more of the

following factors exist:

> (I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II)    An enterprise or industry is a predominant user of the subsidy.
> (III)   An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV)    The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).  In its final rule implementing the Uruguay Round Agreements,

Commerce explained that it considers each of these factors sequentially in order of appearance,

and if one factor warrants a finding of specificity, it will undertake no further analysis.  63 Fed.

Reg. at 65,355.

In this case, Commerce found the On-the-Job training tax credit to be de facto specific

because the actual number of recipients was limited in number on an enterprise basis.  IDM at 56

(citing  19  U.S.C.  §  1677(5A)(D)(iii)(I)).   To  make  its  "limited  in  number"  determination,

Commerce compared "the actual number of companies that received the tax credit in 2018 to the

total number of tax filers, inclusive of corporations and individuals in business, within Québec for

2018."  Id.  GoQ and GoC argue that Commerce's determination was methodologically unsound

because (1) the comparison of credit recipients to total tax filers is an impermissible application of

19 U.S.C. § 1677(5A)(D)(iii)(I),[17] and (2) Commerce's comparison deviates from past practice

---

[17] The statutory evidence cited includes: (i) the statute's first factor says "actual recipients . . . are limited in number," without mentioning potential recipients; (ii) the statute's four factors mirror language in the Agreement on Subsidies and Countervailing Measures; (iii) the Statement of Administrative Action's statement that "the specificity test was intended to function as a rule of

without explanation.  GoQ's Br. at 16, 20–22; GoC's Br. at 24; GoC's Reply at 15 n.19, 16; GoQ's

Reply at 5–6 (proposing that Commerce should have considered only tax filers who provided a

training program to trainees).  In addition, both GoQ and GoC contend that Commerce's finding

that the credit recipients are "limited in number" is unsupported by substantial evidence given the

number and variety of companies participating in the credit program.[18]  GoQ's Br. at 15–16, 19–

20; GoC's Br. at 25–26.

The court concludes that Commerce's finding of de facto specificity was in accordance

with law.  GoQ and GoC agree that the statute does not preclude Commerce from comparing the

actual number of users to potential users, but nevertheless argue that Commerce's methodology is

contrary to the statutory requirements.  GoQ Oral Arg. Subm. at 5–15; GoC Oral Arg. Subm. at

16–17.  It is not.  In applying 19 U.S.C. § 1677(5A)(D)(iii), Commerce found that "the actual

number of recipients that benefited from the tax credit during the POI relative to the total number

---

reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy," Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA");  (iv) the SAA's embrace of Carlisle Tire & Rubber Co. v. United States, 5 CIT 229, 564 F. Supp. 834 (1983), which counseled against finding specificity in generally available benefits to avoid the absurd consequence of countervailing "public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sector," 5 CIT at 234; and (v) language in the SAA wherein, in discussing the four factors, "number" is qualified by words suggesting absolute rather than comparative evaluation.

[18] GoC further argues that Commerce's hierarchical approach is inconsistent with the SAA.  GoC's Reply at 14 ("In particular, the SAA directs [Commerce] to 'seek and consider information relevant to all of {the four} factors.'") (citing SAA at 931) (emphasis in original)).  This argument is unavailing because the SAA continues by providing that (i) "where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity" (as Commerce found here); and (ii) that "[b]ecause the weight accorded to the individual de facto specificity factors is likely to differ from case to case, Commerce shall find de facto specificity if one or more of the factors exists."  SAA at 931.

of tax filers during the POI are limited in number on an enterprise basis."  IDM at 56.  This

comparison both assesses whether "the actual recipients of the subsidy," on an enterprise basis,

"are limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), as well as whether the subsidy in

question is "truly . . . broadly available and widely used throughout [the] economy," IDM at 56

(citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act at

929, H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040) ("SAA").[19]

Accordingly, Commerce's approach neither fails to comply with the statutory language nor

contravenes the underlying aims set out in the SAA.

Nor did Commerce err by using all corporate tax filers as the comparator group when

assessing subsidy specificity.  The Plaintiffs' arguments urging comparison to entities that employ

trainees would improperly convert this test into a standard for predominant use -- a result which is

particularly apparent when considering a limited-in-number analysis on an industry, rather than

enterprise, basis.  Neither the statute's text nor the SAA prohibit Commerce's approach, and it was

reasonable to think that a comparison to corporate tax filers would be instructive in determining

whether the subsidy is widely spread throughout the economy or limited to a small number of

enterprises.  GoQ's attempts to argue otherwise by relying on the court's (and Federal Circuit's)

prior decisions fail.  Bethlehem Steel Corp. v. United States, 25 CIT 307, 140 F. Supp. 2d. 1354

(2001) cannot provide the basis for determining Commerce's past practice with respect to the de

facto specificity analysis relevant here, as the determination in that case employed an industry-

rather than enterprise-level comparison, and further weighed all four rather than merely one of the

---

[19] The SAA "shall be regarded as an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and [the Uruguay Round
Agreements Act] in any judicial proceeding in which a question arises concerning such
interpretation or application."  19 U.S.C. § 3512(d).

factors required for a finding of specificity.  Likewise, neither <u>Royal Thai Gov't v. United States</u>,

28 CIT 1218, 341 F. Supp. 2d 1315 (2004), <u>aff'd in part, rev'd in part, and remanded</u> 436 F.3d

1330 (Fed. Cir. 2006) nor the Federal Circuit's decision in <u>AK Steel Corp. v. United States</u>, 192

F.3d 1367 (Fed. Cir. 1999) involve a finding of "limited in number" specificity alone.  Moreover,

in each of these three cases, Commerce's non-specificity determination was sustained, so they

offer weak evidence that the court here should second-guess Commerce's exercise of its expertise.

On the other hand, Commerce has previously employed similar comparator groups in its past

investigations.  <u>See, e.g.</u>, Issues and Decision Mem. at Cmt. 17 accompanying <u>Final Determ. in</u>

<u>the Countervailing Duty Investigation of 100- to 150-Seat Large Civil Aircraft from Canada</u>, 82

Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017).  In sum, the court finds that Commerce did

not act contrary to law when considering corporate tax filers as the comparator group in its

specificity analysis.

      Finally, the court concludes that Commerce acted reasonably in determining that the actual

recipients were limited in number.  It is instructive that Congress provided this factor for

Commerce to consider without specifying how Commerce should consider the factor.  While GoC

and GoQ are concerned that permitting Commerce to decide the scope of limited use would risk

implicating any subsidy or benefit with less than (near) universal usage, the law itself permits

Commerce to determine the appropriate reach of its specificity determinations.  Although the court

has the authority to consider the reasonableness of Commerce's determination, in this case, where

only 2% of taxpayers received the disputed benefit, it cannot be said (without more) that

Commerce's identification of a limited benefit, and thus of a de facto specific subsidy, is

unreasonable.  Accordingly, Commerce's determination is sustained.

*PUBLIC VERSION*

IV.    ***Commerce's Exclusion of Increased Tax Liabilities to Calculate the Total Benefit of the GASPÉTC Program Was Not Contrary to Law.***

Commerce declined to consider the increased tax liabilities incurred through GASPÉTC in calculating the program's benefit during the period of investigation.  In so doing, Commerce cited 19 C.F.R. § 351.503(e), which provides that "[i]n calculating the amount of a benefit, the Secretary will not consider the tax consequences of the benefit."  IDM at 53.  Commerce noted that it has consistently treated income taxes as outside the statutorily-limited circumstances in which Commerce will subtract offsets from the gross countervailable subsidy amount.  Id. (citing 19 U.S.C. § 1677(6)).  Commerce therefore concluded that the regulation regarding "Direct Taxes" that specifically instructs Commerce to calculate the benefit as the difference between "'tax paid as a result of the program' and 'the tax the firm would have paid in the absence of the program' . . . simply provides direction in assessing how the program results in a benefit in the year at issue (the POI), with no regard to any consequences from the prior year's benefit."  Id. at 54.

GoQ and Marmen contest Commerce's determination and argue that the "Direct Taxes" regulation sets out the only way Commerce may assess the value of the benefit.  Accordingly, GoQ and Marmen argue that Commerce erred by failing to consider the increased tax liability in determining the size of the benefit conferred by GASPÉTC.  They contend that the regulation directing Commerce not to consider tax consequences in calculating benefit, 19 C.F.R. § 351.503(e), is inapplicable because subsection (a) of that regulation and the Preamble each state that a specific rule on how to measure a benefit will be followed when provided.  Marmen's Reply at 17–18; GoQ's Br. at 26; 63 Fed. Reg. at 65,359.  Last, they argue that the exclusive list of statutory offsets is not implicated because Commerce must, in the first instance, determine the tax savings net of increased liabilities according to the "Direct Taxes" regulation's "in the absence of

the program" test before those offsets would even apply.  Marmen's Reply at 15–18;  GoQ's Br.

at 25–26; GoQ's Reply at 9–13.

The court concludes that Commerce acted in accordance with law when it excluded the

taxation of the previous year's tax credit in computing the benefit of GASPÉTC.  It is true that

Commerce may not disregard an existing policy determination manifest in the regulations without

amending the regulations.  Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 101 (2015) (citation

omitted) ("[The Administrative Procedure Act mandates] that agencies use the same procedures

when they amend or repeal a rule as they used to issue the rule in the first instance").  However,

the court is not persuaded that the regulations require that Commerce consider increased tax

liabilities in determining tax benefits.  As Commerce's benefit determination was a reasonable

interpretation of the statute and regulations, its determination was in accordance with law.

Contrary to the arguments made by GoQ and Marmen, "tax paid by a firm as a result of

the program" does not necessarily mean that tax liabilities from a previous year's use of the

program are a component "result of the program."  19 C.F.R. § 351.509(a)(1).  Counselling against

this interpretation of the regulation is Commerce's past practice of not considering tax

consequences and the expectation of less ambiguous language if Commerce intended to implement

a substantial shift in policy.  While the parties have not identified a case or investigation involving

exactly the circumstances at issue here (i.e., the direct inclusion of a tax benefit as taxable income),

Commerce's prior investigations reflect a uniform policy of ignoring tax consequences.  See, e.g.,

Issues and Decision Mem. at 23–24 accompanying Final Determ. in the Countervailing Duty

Investigation of Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea,

77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012); see also, Issues and Decision Mem.

accompanying Certain Softwood Lumber Products From Canada: Final Affirmative

Case 1:20-cv-00172-GSK   Document 37   Filed 03/23/22   Page 31 of 36

Consol. Court No. 20-00168                                                                 Page 31
PUBLIC VERSION

Countervailing Duty Determ., and Final Negative Determ. of Critical Circumstances, 82 Fed. Reg.

51,814 (Dep't Commerce Nov. 8, 2017) (declining to offset a tax credit's effect of reducing

available depreciation).  To read the regulations as GoQ and Marmen urge would create an island

where Commerce considers income tax effects in an ocean where it does not.  Furthermore, it

could radically reshape how Commerce conducts its investigations.  For example, the "total

impact" interpretation might also require Commerce to reduce benefit determinations of

accelerated depreciation programs where a declining balance method confers less depreciation

than otherwise afforded or where earlier additional depreciation results in recognizing a later,

higher gain upon disposition.  These considerations, taken in tandem with the language of the

regulation, strongly suggest that Commerce did not amend its policy of uniformly disregarding tax

consequences through the "Direct Taxes" regulation by embarking on a fundamentally different

method of computing the benefit of tax programs contrary to its practice since the rulemaking.  As

Commerce's interpretation of the regulation is therefore reasonable, and is further consistent with

past practice, its determination is sustained.

**V.    Commerce's Determination that GoQ's and GoC's Additional Depreciation for Buildings Used in Manufacturing Provided a Countervailable Financial Contribution and Benefit is Reasonable and in Accordance with Law.**

Commerce determined that the additional depreciation for qualifying buildings used in

manufacturing under the GoC and GoQ tax systems constituted a countervailable financial

contribution by reference to the revenue foregone relative to the general Class 1 depreciation rate.

IDM at 24, 26.  Similarly, Commerce determined the benefit amount using the additional 6%

depreciation over the CCA treatment those buildings would have otherwise received in the absence

of the additional depreciation provision (that is, a 4% otherwise-applicable rate and a 10% total

rate with additional depreciation).  Id. at 24 (applying the above-discussed "in the absence of the

**PUBLIC VERSION**

program test" from 19 C.F.R. § 351.509(a)(1)).  In its benefit analysis, Commerce noted that "in

order to receive an additional deduction, a taxpayer needs to file an election by using a Schedule

8 form with its income tax return . . . [o]therwise, they would not receive the additional six percent

deduction and instead receive the basic four percent of the CCA."  <u>Id.</u> at 25 (citations omitted).

Commerce rejected the argument that the 10% depreciation rate was just the "normal rate of

depreciation that reflects the actual shorter useful life of the assets used for manufacturing

purposes."  <u>Id.</u>  In so doing, Commerce noted that such argument relies on an implicit assumption

that the relevant universe of taxpayers was those eligible for the special treatment, whereas "the

proper universe of the taxpayers is not limited to the taxpayers who used the non-residential

building within Class 1 assets for manufacturing but includes all taxpayers whose assets satisfy

the scope of the entire Class 1 assets" because only the former can "can file for, and subsequently

receive, the additional CCA."  <u>Id.</u>

     GoQ, GoC and Marmen oppose Commerce's determination.  First, they each argue that

Commerce's determination that a countervailable benefit exists is contrary to law.  They claim that

this additional depreciation does not meet the statutory definition of "financial contribution,"

which, in relevant part, reads "foregoing or not collecting revenue that is otherwise due."  <u>See</u>

GoQ's Br. at 29; GoC's Br. at 18–19; Marmen's Br. at 26–27 (each citing 19 U.S.C. §

1677(5)(D)(ii)).  They contend that there was no revenue otherwise due as the depreciation allowed

is consistent with the policy of CCA and underlying empirical evidence of the average useful life

of the different types of assets.  GoQ's Br. at 30; GoC's Br. at 18–23; Marmen's Br. at 26–27.

Accordingly, the Plaintiffs each argue that the 10% rate is simply the "normal" rate of depreciation,

and not a financial contribution.

Second, GoQ and GoC also argue that Commerce's countervailable benefit determination was contrary to law.  In particular, they argue that Commerce's reliance on the "in the absence of the program" quantification in the "Direct Taxes" regulation begs the question of what taxes the firm would have paid in the absence of a program which sets the base taxation rate for Class 1 assets.  GoQ's Br. at 29–39; GoC's Reply at 9.

Finally, the Plaintiffs each argue that Commerce's determination of financial contribution and benefit is not supported by substantial evidence.  First, they argue that Commerce unreasonably compared two dissimilar classes of assets.  GoQ's Br. at 29–30; GoC's Br. at 17–18; Marmen's Br. at 27.  Second, they argue that Commerce ignored contrary evidence that manufacturing plants have shorter useful lives.  GoQ's Br. at 31; GoC's Reply at 7–9; Marmen's Br. at 27–28.  Third, they argue that it was unreasonable for Commerce not to consider the normal rate of depreciation for the buildings, which here is captured by the additional depreciation as reflected in GoC's empirical study and budget.  GoQ's Br. at 30; GoC's Reply at 8; Marmen's Br. at 27.

The court finds that Commerce's financial contribution and benefit determinations are in accordance with law and supported by substantial evidence.  Commerce acted in accordance with law because it reasonably interpreted both the statutory financial contribution definition and the "Direct Taxes" benefit regulation.  Neither the statutory financial contribution definition nor "Direct Taxes" regulation unambiguously requires Commerce to compare the challenged program to itself, or to the treatment allegedly justified by empirical study, where a default tax rate is applicable in the absence of the challenged program.  The statute's "foregoing or not collecting revenue that is otherwise due" language does not provide an exception for programs which attempt to reflect (successfully or not) the economic reality of depreciation.  Likewise, the regulation's "in

Case 1:20-cv-00172-GSK   Document 37   Filed 03/23/22   Page 34 of 36

Consol. Court No. 20-00168                                                                Page 34
PUBLIC VERSION

the absence of the program" language does not require Commerce to ignore what tax the respondent would pay if not electing better tax treatment. Instead, Commerce reasonably interpreted the statute and regulation to require comparison to the otherwise applicable tax treatment -- provided by the 4% rate applicable if taxpayers did not elect the additional depreciation -- and the court is obliged to accept Commerce's reasonable interpretation as a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984). As the Government and WTTC note, the evidence supports a comparison between the Class 1 depreciation rate and the otherwise applicable rate: first, because the Class 1 depreciation provision is additional to the existing tax scheme; second, because GoC's own budget plan recognizes a default depreciation rate (e.g., "If the taxpayer forgoes the separate class, the current treatment will apply (i.e. a CCA rate of 4 per cent)"); and third, because taxpayers are required to file an election to receive the additional depreciation. Def.'s Br. at 27, 29–30; WTTC's Resp. at 26.

Commerce's determination was also supported by substantial evidence. First, Commerce did not unreasonably compare two dissimilar classes of assets; rather, it compared the different tax treatment under GoQ's and GoC's laws per the classifications those governments provided. Second, Commerce did not ignore contrary record evidence by failing to explicitly engage with the empirical bases supporting GoQ's and GoC's depreciation allowances for certain manufacturing buildings. Rather, Commerce addressed the argument that the challenged depreciation "reflects the actual shorter useful life of the assets used for manufacturing purposes" and reasonably concluded that it was correct to compare the challenged tax treatment to the treatment of the whole of Class 1 assets that applies to those who cannot elect the more

Case 1:20-cv-00172-GSK   Document 37   Filed 03/23/22   Page 35 of 36

Consol. Court No. 20-00168                                                          Page 35
*PUBLIC VERSION*

advantageous treatment.[20]  IDM at 25.  Finally, Commerce did not act unreasonably by declining

to directly engage with the empirical bases governments stipulate as supporting their depreciation

allowances or to treat those adequately supported rates as the normal rate or some other default or

otherwise applicable rates.  Rather, Commerce reasonably concluded that where a taxpayer can

opt-in to more favorable treatment, it is reasonable for Commerce to confine its analysis to the

comparisons provided for by law, even if the more favorable treatment better reflects economic

reality.  Where a government provides an option for more favorable tax treatment, Commerce is

not required to undertake the analysis provided for by statute and regulations by comparing the

challenged tax treatment to itself, even if the tax scheme as a whole attempts to accurately reflect

the economic realities of specific taxpayers.[21]  While the court's holding here does not prohibit

Commerce from assessing empirical bases of a challenged tax program as might be appropriate to

discharge its obligations under the statute and regulations where, for example, a non-elective tax

---

[20] The language in the IDM in response to the Plaintiffs' challenge focuses on the appropriate
comparator group instead of what is the actual rate of depreciation or the empirical bases of the
depreciation allowed.  Nonetheless, Commerce adequately engaged with the record evidence by
taking the position that Commerce must make the comparisons provided for in the statute and
regulation and the Plaintiffs' challenge would have Commerce make an improper comparison.
Accordingly, Commerce is best understood as concluding that even if the actual rate of
depreciation coincides with depreciation allowed, that will not then require Commerce to compare
the tax treatment under the challenged program to itself.  The court holds that Commerce's
approach was not unreasonable or inconsistent with law, even if the more favorable tax treatment
elected more accurately reflects economic wear and tear.

[21] GoC's argument that "[t]here is no norm for determining what is "otherwise due" except . . .
the country in question's own tax system," GoC's Br. at 19, is inapplicable where an election is
available for more favorable tax treatment because the norm relied upon in such case is indeed
provided by the country's own tax system.  Similarly, GoC's argument that according to
Commerce's own description "all claims for all tax deductions must be 'elected' by the taxpayer,"
GoC's Reply at 5, is also inapplicable as it ignores the practical difference that Commerce
implicitly draws between a case in which a taxpayer can claim some tax benefit instead of none at
all and one in which the taxpayer can claim a better tax benefit than a relatively worse one.  The
court's conclusion here is limited to the latter case.

**PUBLIC VERSION**

program is more generous than economically justifiable, the court nevertheless finds that such analysis was neither necessary nor appropriate here.  Commerce's determination that the additional depreciation rate available for Class 1 assets constituted a countervailable benefit is therefore sustained.

## CONCLUSION

The court concludes that Commerce's final determination was in accordance with law and supported by substantial evidence.  First, Commerce permissibly excluded the foreign auditor's adjustment as unreliable.  Second, Commerce reasonably and lawfully determined that the Québec Local Content Requirement provided a recurring benefit.  Third, Commerce acted reasonably within its statutory authority under 19 U.S.C. § 1677(5A)(D)(iii) in determining that the Québec On-the-Job Training tax credit was a de facto specific subsidy.  Fourth, Commerce acted in accordance with law in excluding increased tax liabilities when conducting the benefit calculation for GASPÉTC.  Fifth and finally, Commerce acted reasonably and lawfully when determining financial contribution and benefit from additional depreciation for buildings used in manufacturing by comparison to the rate applicable if the additional depreciation were not claimed.

For the foregoing reasons, Plaintiffs' and Defendant-Intervenor's motions for judgment on the agency record are denied; Commerce's Final Results are sustained, and judgment is entered in favor of the United States.

**SO ORDERED.**

                                                                              /s/  Gary S. Katzmann
                                                                              Gary S. Katzmann, Judge


 Dated: March 18, 2022
         New York, New York